GUS COREY AND HELEN COREY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 57238.   Filed November 26, 1957.

*Clifford A. Jones, Esq.*, for the petitioners.
*Eugene F. Reardon, Esq.*, for the respondent.

OPINION.

FORRESTER, *Judge:* The respondent has determined a deficiency in petitioners' income tax for the calendar year 1953 in the amount of $3,362.74. All but one of the respondent's adjustments have been settled prior to trial. The sole issue submitted is whether respondent erred in disallowing a net operating loss carryover to the year 1953 in the amount of $14,683.45. This is in turn dependent on whether a loss sustained by petitioners in 1952 in the amount of $22,203.80 qualifies as a net operating loss under the terms of section 122 of the Internal Revenue Code of 1939.[1]

Petitioners, husband and wife, reside in Santa Barbara, California. They filed their joint income tax return for the calendar year 1953 with the district director of internal revenue for the district of Nevada. All of the facts have been stipulated and are found accordingly.

On April 18, 1952, petitioners opened a restaurant in Las Vegas, Nevada, under the name Restaurant Cinnabar. The restaurant occupied premises which petitioners had subleased at an earlier date. The terms of the sublease entitled petitioners to take possession of the subleased premises for the term beginning December 1, 1951, and ending August 31, 1956. The sublease also provided that they should pay a monthly rental in the amount of $250. In the event of any breach of condition or upon the failure of any rental payment, the sublessor reserved the right to take immediate possession of the premises and terminate the sublease.

As mentioned above, petitioners opened their business to customers on April 18, 1952. In preparation for this event they expended $26,493.16 for permanent, immovable improvements.

The business was not financially successful and in early December 1952, it was terminated and the restaurant was closed. The rent due the sublessor for the month of December 1952 and for the month of January 1953 was not paid.

---

[1] SEC. 122. NET OPERATING LOSS DEDUCTION.

(a) DEFINITION OF NET OPERATING LOSS.—As used in this section, the term "net operating loss" means the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d).

* * * * * * *

(d) EXCEPTIONS, ADDITIONS, AND LIMITATIONS.—The exceptions, additions, and limitations referred to in subsections (a), (b), and (c) shall be as follows:

* * * * * * *

(5) Deductions otherwise allowed by law not attributable to the operation of a trade or business regularly carried on by the taxpayer shall (in the case of a taxpayer other than a corporation) be allowed only to the extent of the amount of the gross income not derived from such trade or business. * * *

On February 6, 1953, a notice of termination of the lease was served on petitioner Gus Corey by the sublessor. Under the terms of the sublease the permanent, immovable improvements reverted to petitioners' sublessor.

The issue of the net operating loss carryover arises as follows: In their 1952 income tax return, petitioners reported a loss from the operation of their business in the amount of $43,690.42. Of this amount $27,478.16 was listed in Schedule C of the return as losses from business property. The description "Lease abandonment loss" was applied to $25,589.54 of this latter amount.

Subsequently, on March 16, 1953, petitioners filed a claim for refund of 1951 taxes paid. The refund claim states: "Net operating loss in 1952 ($42,002.31) sufficient to offset entire amount of 1951 income resulting in refund of 1951 tax paid."

Petitioners intended thereby to claim a net operating loss carryback from 1952 to 1951 in an amount sufficient to eliminate all 1951 income tax liability. Their correct net income for the calendar year 1951 is $15,041.31, without taking into account the claimed net operating loss carryback deduction.

In the 1953 income tax return petitioners claimed a net operating loss deduction in the amount of $14,683.45. This sum represented, according to their calculations, the balance of the reported 1952 net operating loss after carrying back an amount sufficient to offset all of the income reported in their 1951 income tax return. Petitioners' correct net income for 1953, without taking into account any net operating loss carryover deduction, is $15,372.76.

In the statutory notice of deficiency for 1953, respondent, in computing the amount of overassessment for the year 1951, allowed a net operating loss carryback deduction from 1952 in the amount of $9,903.11. Respondent's computations are as follows:

### EXPLANATION OF ADJUSTMENT

#### YEAR: 1951

\*      \*      \*      \*      \*      \*      \*

(c) A net operating loss deduction in the amount of $9,903.11 is allowed as the result of the carryback of the net operating loss incurred in 1952, computed as follows:

| | | |
|---|---:|---:|
| Net operating loss as shown in 1952 return | | $43,690.42 |
| Add: (1) Loss from sale of food and supplies | | 510.59 |
|     Total | | 44,201.01 |
| Less: (2) Abandonment loss | $27,478.16 | |
|     (3) Decrease in depreciation and amortization | 1,819.74 | 29,297.90 |
| Net operating loss as adjusted | | 14,903.11 |
| Less: (4) Capital gain adjustment under the provisions of section 122 (d) of the Internal Revenue Code of 1939 | | 5,000.00 |
| Net operating loss carryback deduction | | 9,903.11 |

In the same notice of deficiency respondent disallowed, in full, the reported net operating loss carryover to 1953 on the ground that the 1952 net operating loss was not in excess of $9,903.11, all of which was absorbed in being carried back to 1951.

Petitioners agree that the sum of $27,478.16 claimed by them on Schedule C of their 1952 return as "Losses of Business Property" is excessive and now claim only $22,203.80. This amount is computed by subtracting an allowed amortization deduction for the year 1952 in the amount of $4,289.36 from the $26,493.16 cost of the permanent, immovable improvements. Respondent's disallowance of the asserted net operating loss carryover deduction is based on his determination that the sum of $22,203.80 does not represent a loss incurred in the ordinary operation of the business.

Net operating loss is defined in section 122 (a) of the Internal Revenue Code of 1939 as the excess of deductions allowable under chapter 1 of subtitle A of the Code over gross income, subject to the exceptions, additions, and limitations provided for in subsection (d) of section 122. Paragraph (5) of subsection (d) excludes for the purposes of carryback and carryover, deductions otherwise allowed by law, but which are not attributable to the operation of a trade or business regularly carried on.

In order for petitioners to prevail they must prove that the loss in question was attributable to the operation of a trade or business regularly carried on by them.

Petitioners do not dispute respondent's position to the effect that they were engaged in the business of operating a restaurant business during 1952 and were not engaged in the business of disposing of business property by abandonment. They instead maintain that they erroneously listed the loss as "Lease abandonment loss" in their 1952 income tax return when in reality the facts make it "accelerated amortization." Petitioners cite one case from this Court and two appellate decisions as authority for this contention. See *Washington Catering Co.*, 9 B. T. A. 743 (1927); *George H. Bowman Co.* v. *Commissioner*, (C. A., D. C., 1929) 32 F. 2d 404, affirming 7 B. T. A. 399 (1927); *Cassatt* v. *Commissioner*, (C. A. 3, 1943) 137 F. 2d 745, affirming 47 B. T. A. 400 (1942).

We have carefully studied each of the above three cases and find ourselves in agreement with their respective holdings but disagree as to their applicability to the net operating loss issue. Each holds that the proper year for deducting the unrecovered basis of leasehold improvements is the year in which the business lease is terminated. None of the cases describes the deduction as amortization. In fact, the implication instead is that the expense is a business loss and thus properly deductible under section 23 (e). See *Helvering* v. *Manhattan Life Ins. Co.*, (C. A. 2, 1934) 71 F. 2d 292.

The theory behind the amortization of the cost of leasehold improvements over the term of the lease is that the improvements will assist in producing income over the entire period of the lease. *Cassatt* v. *Commissioner, supra*, p. 749. Where, instead, the lease is ended, then the basis for further amortization of such expenditures is gone and any unamortized portion then remaining must be charged off at once. *Helvering* v. *Manhattan Life Ins. Co., supra*, is representative of this approach. There the taxpayer lessor paid a broker $9,900 for procuring a new tenant. The lease agreed upon was for a term of 10 years. At the end of 1 year the lease was terminated by court order. The taxpayer sought to deduct the unamortized brokerage fee in the year of termination. Judge Learned Hand, speaking for the Court of Appeals, stated (pp. 293–294) :

When the lease ends, it is impossible to spread the unamortized installments retroactively over the past years, and there is certainly no warrant for accelerating them all as an expense for the last year. If they are to be allowed at all in that year it must therefore be as a loss * * *

Characterization of the item in any event satisfies only one of the statutory tests of section 122. What is required is evidence that the loss or expense, which is an allowable deduction, be sustained as an incident to the ordinary and normal course of a trade or business regularly carried on by the taxpayer. *Foreman* v. *Harrison*, (N. D., Ill., 1948) 79 F. Supp. 987.

The clause "attributable to the operation of a trade or business" was construed by the Supreme Court in *Dalton* v. *Bowers*, 287 U. S. 404 (1932). Referring to section 206 of the Revenue Act of 1924, that Court, quoting from the opinion of the Court of Appeals, stated (p. 408) :

By the statute, allowing the deductions and carrying over the loss for two years, Congress intended to give relief to persons engaged in an established business for losses incurred during a year of depression in order to equalize taxation in the two succeeding and more profitable years. It was not intended to apply to occasional or isolated losses * * *

Other courts following this rule have held that the sale or other disposition of all or a substantial part of the income-producing assets of a business constitutes an isolated transaction which is not incident to the ordinary and normal course of a trade or business regularly carried on by the taxpayer. *Joseph L. Merrill*, 9 T. C. 291 (1947), affd. (C. A. 2, 1949) 173 F. 2d 310; *Joseph Sic*, 10 T. C. 1096 (1948), affd. (C. A. 8, 1949) 177 F. 2d 469, certiorari denied 339 U. S. 913 (1950) ; *Lazier* v. *United States*, (C. A. 8, 1948) 170 F. 2d 521; *Hartwig N. Baruch*, 11 T. C. 96 (1948), affirmed per curiam (C. A. 2, 1949) 178 F. 2d 402; *Foreman* v. *Harrison, supra;* and *Pettit* v. *Commissioner*, (C. A. 5, 1949) 175 F. 2d 195, affirming per curiam a Memorandum Opinion of this Court dated June 10, 1948.

The rationale of the courts has been that the sale or other disposition of the physical assets of a business is the equivalent of the liquidation of that business, and therefore the exact antithesis of the normal operation of a business regularly carried on. This rationale was stated in *Lazier* v. *United States, supra,* at 526, as follows:

Congress was concerned with "net operating losses" sustained in the normal operation of a business regularly carried on by a taxpayer and was not concerned with losses attributable to the total or partial liquidation of the physical properties used in the conduct of the business. See Mertens, Law of Federal Income Taxation, Vol. 5, page 318, § 29.05. * * *

In the instant case the termination of petitioners' restaurant business occurred in early December 1952. Petitioners sustained a loss in the amount of $22,203.80, representing the unrecovered basis of the permanent leasehold improvements. This loss is clearly traceable to the operation of petitioners' business. It is, however, not attributable to the operation of a business "regularly carried on" by the petitioners. Since the loss was an isolated transaction incident to the total liquidation of the business, we must hold in favor of the respondent.

It should be mentioned that the parties have based their pleadings and proof on an assumption that the loss in question was sustained in the year 1952. We have made no holding on this issue nor do we do so here. It suffices to point out that the "Notice of Termination" of the sublease was received on February 6, 1953. The sublease agreement would lead us to believe that the breach of condition for failure of rentals could have been corrected at any time prior to that date. We, of course, cannot say whether the right to possession of the permanent leasehold fixtures was valueless after the termination of the business. If, however, there was any possibility of reopening the restaurant or assigning the lease it could be argued that the loss was not sustained until after the new year.

The year of loss is especially important in the instant case because if the loss was in fact sustained in 1953, then petitioners would not be limited to proving a deductible 1952 net operating loss carryover but could, in the alternative, qualify their business loss under section 23 (e).[2]

The parties, however, have not raised the issue of a 1953 loss in their pleadings or proof and we are not free to do so here. *Camp Wolters Enterprises, Inc.*, 22 T. C. 737 (1954) ; *Earl V. Perry*, 22 T. C. 968 (1954).

*Decision will be entered under Rule 50.*

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
  In computing net income there shall be allowed as deductions:
  *   *   *   *   *   *   *
    (e) LOSSES BY INDIVIDUALS.—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—
      (1) if incurred in trade or business ; or
      (2) if incurred in any transaction entered into for profit, though not connected with the trade or business ; * * *