ARTHUR R. FIXEL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fixel v. Commissioner
Docket No. 8634-72.
United States Tax Court
T.C. Memo 1974-197; 1974 Tax Ct. Memo LEXIS 123; 33 T.C.M. (CCH) 857; T.C.M. (RIA) 74197; July 30, 1974, Filed. Victor M. Cawthon, for the petitioner. Robert P. Edler, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency of $33,470.23 in petitioner's 1966 Federal income tax. The sole issue for decision is whether, under sections 741 and 752, [1] petitioner recognized gain on the sale or exchange of a partnership interest where the purchaser assumed petitioner's share of the partnership's liabilities. FINDINGS OF FACT Arthur R. Fixel (herein *125 referred to as petitioner) resided in Quincy, Florida, at the time his petition was filed with this Court. On or about October 21, 1955, a partnership, Effano Farms (hereinafter the partnership), was organized with petitioner and Barry M. Ottinger (hereinafter Ottinger) as equal partners. The partnership's principal activity was raising Florida shade-grown cigar wrapper tobacco. It filed annual partnership information returns for each calendar year, through the year ended December 31, 1965. The partnership was dissolved effective June 30, 1966, and petitioner assigned and conveyed his share of the partnership's assets to Ottinger, in exchange for the latter's agreement to assume petitioner's share of the partnership's liabilities. Petitioner received no cash in connection with this exchange, nor were any partnership assets distributed to him. After the partnership was dissolved, a final information return was filed covering the period January 1, 1966, through June 30, 1966. The partnership's books as of June 30, 1966 from which the partnership's last information return was prepared, showed that the capital accounts of petitioner and Ottinger had deficit balances of $92,118.33 *126 and $77,686.51, respectively. The total deficit in the capital accounts equaled the amount by which the partnership's liabilities ($502,502.07) exceeded the book value of its assets ($332,697.23). Included in this latter figure was $173,238.54, the value of the partnership's tobacco inventory, valued at the lower of cost or market. The record does not show whether petitioner was insolvent prior to or at the time of the transfer to Ottinger. His assets as of July 1, 1966, included: 1. A checking account with a balance claimed by petitioner to be $866.77. 2. Six or seven life insurance policies with a claimed combined cash value of $15,178.87. [2]
3. A lot in Quincy, Florida, and a lot in Gretna, Florida, acquired sometime in the early 1950's at a total cost of approximately $1,400. 4. Approximately 85 percent of the fifty outstanding shares of stock in 385 East Jefferson, Inc. (hereinafter 385 EJI).
5. Stock in Calvary Tobacco Growers, Inc. (hereinafter *127 CTGI), sold at some unspecified date after the year in issue for $2,700. 6. A 1965 Ford Mustang, purchased the previous year for $2,400. 7. Stock in the Blackstone Cigar Company sold later that year for $334.74. 8. Stock in First Western Financial Corporation, sold later that year for $517.37. 9. A $50, series E, United States Government Savings Bond. 10. An interest in a trust holding rental property. 11. Several duplex apartments owned jointly with his wife. In addition to these assets, the record shows that during 1966 petitioner received $4,150.85 from the sale of other stock and a salary of $50,500. As of July 1, 1966, petitioner had the following liabilities: 1. Quincy State Bank, $6,000; 2. Loans on insurance policies of $5,141.60; [3]
And 3. Miscellaneous bills in the amount of $356.62. In the notice of deficiency respondent determined that petitioner realized a long-term capital gain of $58,332.88 as a result of the assignment of his interest in the partnership to Ottinger, computed as follows: [4]
*128 Partnership Liabilities
$502,502.07
Partnership Assets - Book Value 397,068.14
$105,433.93
Ottinger's Share of the Liabilities 45,501.05
$ 59,932.88
Legal Fees Paid 1,600.00
Gain Realized
$ 58,332.88
The parties have agreed that the book value of the partnership's assets was $332,697.23 rather than $397,068.14. Respondent has conceded that Ottinger's share of the partnership's liabilities was $77,686.51.
OPINION Stated in general terms, section 741 provides that, subject to certain exceptions not applicable here, capital gain or loss is recognized on the sale or exchange of an interest in a partnership. Section 752 provides that, in computing the amount of such gain or loss, a decrease in the amount of the selling partner's share of the partnership's liabilities shall be considered as a distribution of money, i.e., capital gain to the extent such decrease exceeds the partner's adjusted basis for the partnership interest. Relying upon these provisions, respondent maintains that petitioner realized a net gain of $90,518.33 on the disposition of his interest in the partnership to Ottinger. Petitioner contends that sections 741 and 752 are qualified *129 by the general provisions of section 61 and its related regulations (section 1.61-12, Income Tax Regs.) and that his gain from Ottinger's assumption of liabilities is limited to the amount of his solvency on June 30, 1966, the date on which Ottinger assumed the partnership's liabilities. Cf. Stackhouse v. United States, 441 F.2d 465 (C.A. 5, 1971). We do not find it necessary to decide whether a partner's gain under sections 741 and 752 is implicitly limited to his net worth without regard to the partnership's liabilities, since petitioner has not proved the value of his assets on June 30, 1966. The factual premise of this argument, therefore, has not been established. Petitioner initially claimed that his net worth immediately after his share of the partnership's liabilities was assumed was $20,644.64. Accordingly, he contended that his taxable gain could not exceed that amount when Ottinger assumed the partnership's liabilities. He summarized the evidence on his financial situation at that time by presenting the following table: Assests:
Cash
$ 866.77
Cash value of life insurance
15,178.87
Automobile
1,800.00
Real estate
1,400.00
Stock in Calvary Tobacco Growers, Inc. (CTGI)
2,700.00
Stock in 385 East Jefferson, Inc. (385 EJI)
9,350.00
Stock in Blackstone Cigar Company and First Western Financial Corp. 847.22
Total Assets
$32,142.86
Liabilities:
Quincy State Bank
$ 6,000.00
Iinsurance policy loans
5,141.60
Bills payable 356.62
Total Liabilities
$11,498.22
Net Worth
$20,644.64
*130 Petitioner testified, in general terms, that his assets and liabilities were in the amounts set forth in this table and argues that, since respondent introduced no evidence to the contrary, his testimony establishes a prima facie case.In his reply brief, however, petitioner contends that under Florida law (Fla. Stat. Ann. sec. 222.14 (1961)), the case value of the insurance is not subject to levy by his creditors and, therefore, both the cash value and insurance loan items should be eliminated from this computation, leaving a net worth of only $10,607.37. We are not satisfied either as to the accuracy of the values of the listed assets or the completeness of the list. Petitioner presented no documentary evidence whatever to substantiate his testimony regarding the value of his various assets. For example, he failed to corroborate his testimony regarding the amount of his cash on hand by introducing bank statements. While he admittedly had several life insurance policies, he introduced none of them into evidence. He asks us to accept his interpretation of his rights under the policies and the cash surrender tables therein without allowing either respondent *131 or the Court to verify the correctness of his conclusions. The real estate listed in the table consists of two lots, one acquired in 1955 and the other within two or three years of that date. The value assigned to these properties ($1,400) was their cost, not their fair market value on June 30, 1966. We have nothing except petitioner's uncorroborated testimony that these lots failed to increase in value from 1955 to 1966, in marked contrast to most other real estate during that period. As to the value of the CTGI and 385 EJI stock listed above, each of the corporations was closely held. The record contains no evidence as to their earnings history, their dividends record, or reliable estimates of the value of their underlying assets. Petitioner testified that CTGI stock was sold for $2,700 within three months of June 30, 1966, but we are given none of the details with respect to the sale, especially facts which would enable us to decide whether the sale was an arm's-length transaction reflecting the fair market value of the stock. Likewise, we have no specific information on the 385 EJI stock to support petitioner's estimated value of $9,350. Indeed, the notice of deficiency *132 shows adjustments, not contested in the petition, for sales of 3 shares of this stock for $1,915.38, 2-1/2 shares for $1,596.15, and 7-1/2 shares for $4,788.47, indicating a value of approximately $638.50 per share. Petitioner testified that he owned approximately 85 percent of the 50 outstanding shares of the corporation, about 42.5 shares. Using the per-share value reflected by these sales referred to in the notice of deficiency, his stock in this corporation had a value in excess of $27,000 rather than the $9,350 set forth in his list of assets. Moreover, the list of assets is not complete.Petitioner's income tax return for 1966 shows income from a joint venture, Fixel & Fixel, not included in the list. On cross-examination, petitioner testified that this was a joint venture with his wife. Its assets, according to the income tax return, included four duplex apartment houses acquired in 1959 and 1961 at a cost of $44,375.16 and a fifth duplex apartment house acquired in 1965 at a cost of $11,150. Petitioner presented no evidence as to the value of these properties on June 30, 1966. Further, the evidence does not show whether the joint venture owned other assets. Petitioner *133 testified that his interest in all except one of these apartment houses was transferred to a trust prior to June 30, 1966. But we are not convinced this is true. The depreciation schedule attached to his 1966 income tax return credits the joint venture with depreciation on four of the buildings "Less amount used by Trust from 8/17/66", indicating that the joint venture still owned these apartment houses on June 30, 1966. The joint venture evidently continued to own the fifth one throughout 1966. Moreover, we have no information regarding the terms of the trust to which the apartment houses were allegedly transferred or the circumstances or purposes of its creation, e.g., whether its assets would be available to petitioner's creditors. Petitioner testified that "It was a sort of an ownership - I was never to receive the property back. I think my wife and I were to receive the income while we lived * * *." But this conclusory testimony is not an acceptable substitute for the deeds of transfer, the trust instruments, and other specific facts concerning the trust. Petitioner's income tax return for 1966 also refers to a Security Investment Trust not mentioned in his list of *134 assets. On cross-examination petitioner explained that this trust was set up for him by his parents. He testified that prior to June 30, 1966, he transferred his interest in this trust to a trust for the benefit of his children. But here, again, we have no documatation of any such transfer and no other corroborating evidence. As a result we do not know whether petitioner actually parted with his ownership of this property before June 30, 1966, or at any time. We have no evidence as to the terms of the Security Investment Trust, e.g., whether its terms permitted the alleged conveyance to a trust for his children. Moreover, the record contains no evidence whatever regarding the value of his interest in the trust. Petitioner's income tax return for 1966 shows that he received a salary of $50,500 in that year. He had served as president of Florida Shade Tobacco Growers, Inc., for several years and appeared to be an able individual. However, the seemingly studied vagueness of his testimony precludes a reliable finding as to his net worth on June 30, 1966.We do not know what assets he actually owned on that date, and we are not convinced that his estimates of value for the assets *135 he admittedly owned are reasonable. Accordingly, we hold that petitioner has failed to prove that his net worth on June 30, 1966, was less than the amount of his share of the partnership liabilities which Ottinger assumed. Under the formula used in the notice of deficiency, his gain is computed as follows: Partnership Liabilities
$502,502,07
Partnership Assets - Book Value 332,697.23
169,804.84
Ottinger's Share of the Liabilities 77,686.51
$ 92,118.33
Legal Fees Paid 1,600.00
Gain Realized
$ 90,518.33
Petitioner, citing Berkshire Mutual Insurance Co. v. Moffett, 378 F.2d 1007(C.A. 5, 1967), [5] argues that the "owner of personal property is qualified by his ownership alone to testify as to its value." While it is true that the Tax Court may not arbitrarily discredit or disregard competent, relevant, and credible testimony which is uncontradicted, Quock Ting v. United States, 140 U.S. 417, 420-421 (1891); Foran v. Commissioner, 165 F.2d 705, 707 (C.A. 5, 1948), reversing a Memorandum Opinion of this Court, we are "not bound to accept testimony at face value even when it is uncontroverted if it is improbable, *136 unreasonable or questionable." Archer v. Commissioner, 227 F.2d 270, 273 (C.A. 5, 1955); Commissioner v. Smith, 285 F.2d 91, 96 (C.A. 5, 1960).[6] The determining factor in these cases is credibility. Where, because of the witness' self-interest, improbability of the testimony, contradictions, or omissions, the testimony lacks credibility, it may be disregarded. Carmack v. Commissioner, 183 F.2d 1, 2 (C.A. 5, 1950), certiorari denied 340 U.S. 875 (1950); Boyett v. Commissioner, 204 F.2d 205, 208 (C.A. 5, 1953); Carter v. Commissioner, 257 F.2d 595, 599 (C.A. 5, 1958).[7]
*137 Petitioner's testimony as to his net worth was, as noted previously, replete with uncertainty as to the facts, contained contradictions and omissions of items, and was filled with bold assertions of value without any documentary or other corroborative evidence. And the evidence is sufficient to indicate that some of the items listed on his schedule of assets were substantially undervalued. In light of this record, we cannot say that petitioner's testimony is entitled to much evidentiary weight. Further, petitioner's failure to present documentary evidence within his possession to corroborate his testimony leads to an inference that such evidence would not have been favorable to his case. Wichita Terminal Elevator Co., 6 T.C. 1158, 1165, (1946), aff'd 162 F.2d 513 (C.A. 10, 1947). Interstate Circuit v. United States, 306 U.S. 208, 226 (1939). To reflect the foregoing conclusion, and several adjustments in the statutory notice which were not contested, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted. ↩
2. The record does not show on whose life the life insurance policies were issued, or if any of the policies were specifically taken out for the benefit of any of his creditors, or the cash values of those policies. ↩
3. The record does not show how many of the life insurance policies had loans against them. ↩
4. Under the statute and regulations, when a partnership interest is sold or exchanged and the purchaser assumes the seller's share of partnership liabilities, the amount of those liabilities are added to the amount otherwise realized by the seller. Sec. 752(d); sec. 1.752-1(d), Income Tax Regs. The seller recognizes capital gain to the extent that the total amount realized exceeds his adjusted basis in the partnership interest. Secs. 705, 731(a), 741, and 752(b); sec. 1.741-1(a), Income Tax Regs.↩ Cf. Milton Falkoff, 62 T.C. [*] (May 15, 1974). This computation does not appear to follow the statutory formula, but neither party has questioned the manner in which petitioner's gain was calculated. 5. The court in the above-cited case discussed the Florida "Broad Evidence Rule" which allows the trier of fact to consider any evidence which logically tends to establish a correct estimate of value for destroyed property and held, in part, that there was in the record a rational basis for the jury's determination. It also held that, although the party's opinion was admissible, it was to be weighed in light of his self-interest and the factors underlying his estimate of value. ↩
6. These opinions affirm Memorandum Opinions of this Court. ↩
7. These opinions affirm Memorandum Opinions of this Court. ↩